IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‛I

| | | |
|---|---|---|
| JAMES SCOTT SPARKMAN, | ) | CV. NO. 08-00087 DAE-BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

On December 21, 2009, the Court heard Defendant's Motion.  Hillary

Snyder, US Department of Justice, appeared at the hearing on behalf of Defendant;

Richard Paul McClellan III, Esq., appeared at the hearing on behalf of Plaintiff.

After reviewing the motion and the supporting and opposing memoranda, the Court

**GRANTS IN PART AND DENIES IN PART** Defendant's Motion.

The Court GRANTS Defendant's motion for partial summary

judgment as to the Government's contention that Sparkman organized and

participated in the sale of program # 4 and the Government's contention that

Sparkman made tax statements  regarding the allowability of a deduction or credit

made in conjunction with program # 4.  The Court DENIES Defendant's motion

for partial summary judgment as to the Government's contention that the tax statements made by Sparkman were false.

BACKGROUND

J. Scott Sparkman is a resident of Hawaii and has a license to install solar energy equipment. (Government's Statement of Undisputed Material Facts "GSF" ¶ 1, Doc. # 27.) From 2001 through 2005, Sparkman managed and controlled Hawaii Environmental Holdings ("HEH") and The Power Change Company, LLC ("PCC").[1] (Id. ¶ 2.) From 2003 through 2005, Mercury Solar became a trade name of HEH, and at that time, Sparkman managed and controlled Mercury Solar. Prior to 2003, Sparkman held varying titles and responsibilities regarding the operation of Mercury Solar. (Id. ¶ 3.) HEH, PCC and Mercury Solar sold, through its sales people, various solar energy products and programs to Hawaii residents. Specifically, the companies marketed solar energy products through four separate programs: "program # 1," "program # 2," "program # 3," and "program # 4." (Id. ¶ 4.) Sparkman developed the four programs and decided that HEH, Mercury Solar, and PCC would sell them. (Id. ¶ 5.) No other business in Hawaii offers "program # 4." (Id. ¶ 6.)

---

[1] Although the Court cites to the Government's statement of facts, these facts are uncontroverted unless otherwise noted. (See Plaintiff's Statement of Accepted, Disputed, and Additional Material Facts "PSF," Doc. # 47.)

A.     Procedural History

In 2005, the Government sought injunctive relief against Sparkman, HEH, PCC, and Mercury Solar in an effort to enjoin Sparkman and the entities from making allegedly false tax-related statements in conjunction with programs  # 3 and # 4.  The parties agreed to an injunction and, on October 30, 2006, Judge Gillmor signed a consent injunction order.  The agreed terms of the injunction permitted the IRS to assess and allowed Sparkman to contest Internal Revenue Code § 6700 penalties.  (Id. ¶ 7.)

On July 9, 2007, the IRS assessed Internal Revenue Code § 6700 penalties against Sparkman totaling $382,000 for tax years 2001 through 2005. (Id. ¶ 8.)  Sparkman paid slightly more than 15% of the assessed penalties and sued for a refund by filing a Complaint in this Court.  (Id.; "Compl.," Doc. # 1.)  The Government counterclaimed for the balance plus interest.  ("Countercl.," Dkt. # 6.)

On November 15, 2009, the Government filed a motion for partial summary judgment.  ("Mot.," Doc. # 24.)  Specifically, the Government seeks a judgment finding that Sparkman made false tax statements in conjunction with the organization and sale of 239 programs # 4.  ("MPSJ," Doc. # 25.)

3

STANDARD OF REVIEW

Rule 56 permits a plaintiff to move "for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a) (emphasis added); Robi v. Five Platters, Inc., 918 F.2d 1439, 1441-42 (9th Cir. 2000).  Rule 56 requires summary judgment to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine

4

issue for trial" and may not rely on the mere allegations in the pleadings.   Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  If the nonmoving party produces direct evidence of a material fact, the

court may not assess the credibility of this evidence nor weigh against it any

conflicting evidence presented by the moving party.  T.W. Electrical Service, 809

F.2d at 632.

DISCUSSION

I.    Sparkman's Organization and Participation in the Sale of Program # 4

Sparkman developed the program # 4 and directed HEH, Mercury

Solar, and PCC to sell the program.  (GSF ¶ 5.)  According to the parties, program

# 4 works as follows: Mercury Solar sold participants solar energy systems

(typically thermal solar hot water heaters or  photovoltaic systems) for investment

purposes, along with solar energy systems for the participants' homes.  (Id. ¶ 9.)

Mercury Solar installed the second, investment system on a third party's home or

business.  (Id.)  The two systems were typically financed with a combination of

Wells Fargo Financing, a possibility of $575 to $1150 in marketing money earned

by the participant, and a loan from Mercury Solar.  (Id.; Plaintiff's Statement of

Accepted, Disputed, and Additional Material Facts "PSF" ¶ 9, Doc. # 47.)  By

purchasing the second investment system, the participants purportedly became the

5

sole proprietor of his/her own micro-utility business.  Participants had reason to believe that they would make some profit on their investment systems, based upon the Sparkman's deal worksheets.  (GSF, Ex. E.)

The third party, on whom's house the investment system is placed, is called a "ratepayer."  The ratepayer signed a contract to pay a fixed, monthly fee for use of the solar energy system, but also has the option of paying an up front lump sum.  (Id. ¶ 9.)  PCC assigned ratepayers to virtually all of the program # 4 customers.  (Id. ¶ 24.)  The ratepayers either came before participants or on occasion were identified or recruited by a participant for the participant's program # 4.  (Id.)

Generally, PCC collected the ratepayer's fees and used the money to pay general excise tax (this was paid for all participants through one account in the name of PCC) and to pay a management fee (7%) owed by the participants to PCC.  (Id. ¶ 9.)  Some participants did not use PCC as a collection agent, but collected payments directly from the ratepayers.  (PSF ¶ 9C.)  The remainder of the ratepayer's payments were used by PCC to offset the loan between the participants and Mercury Solar.  (GSF ¶ 9.) Mercury Solar sold the personal and business

6

systems to the participants at prevailing residential market prices.  (PSF ¶ 9B.)

Participants legally bore the risk of ratepayer non-payment.[2]  (Id. ¶ 9C.)

Pursuant to the terms of the consent injunction order, Sparkman

turned over a customer list, which reflected that 239 people during the 2001

through 2005 time frame purchased program # 4 . (Id. ¶ 10.)  Sparkman, through

the HEH/Mercury Solar and PCC, marketed program # 4 to individuals with tax

liabilities and calls it the "net zero deal" because of the purported tax benefits.  (Id.

¶ 11; PSF ¶ 11.)  During the time period from 2001 through 2005, HEH/Mercury

Solar had two to twelve "closer" salespeople that sold program # 4.  (GSF ¶ 12.)

Sparkman trained or assisted in the training of the closer salespeople.  (Id. ¶ 13.)

In opposition to the Government's motion, Sparkman does not argue

that he did not organize program # 4, that there were 239 programs # 4, or that he

did not participate in their sale.  The undisputed facts show that Sparkman

organized, or at least assisted in the organization of, 239 programs #4, by

developing the program and authorizing its sale.  Additionally, Sparkman

participated, at least indirectly, in the sale of 239 programs # 4 by developing the

---

[2] The Court notes that although the participants may have believed to bear the risk of non-payment, the fact that a majority of the rate payers paid in a lump sum up front before they were even matched with a participant made any risk of default in the Mercury Solar loan illusory.  (GSF ¶ 27; PSF ¶ 27.)

program, authorizing its sale, and providing training and materials to the sales people.   Therefore, the Court finds that no genuine issue of fact remains.

Accordingly, the Court GRANTS Defendant's motion for partial summary judgment as to the Government's contention that Sparkman organized and participated in the sale of program # 4.

II.   <u>Tax Statement's Made, or Caused to be Made, by Sparkman in Conjunction with Program # 4</u>

In conjunction with each program # 4 sale, Sparkman's salespeople used a "worksheet" developed by Sparkman and titled "Mercury Solar Worksheet Zero Net/Free Solar" to highlight and promote the purported tax benefits of program # 4, including the I.R.C. § 48 business tax credit and I.R.C. § 179 depreciation expense deduction.  The worksheets indicated that the customers would receive the purported tax benefits within the first 12 months of purchasing a program # 4.  (GSF ¶ 14.)

Additionally, each program # 4 customer received a "tax" guarantee from Mercury Solar whereby Mercury Solar guaranteed the § 48 credit and § 179 depreciation expense as long as the customer had enough tax liability offset the deductions.  (<u>Id.</u> ¶ 15; PSF ¶ 15.)  Each year, Sparkman provided each customer of program # 4 with a "fact pack," which Sparkman drafted and compiled.  (GSF

¶ 16; PSF ¶ 15.)  The salespeople had access to the fact packs in marketing program # 4 and either provided the customers with them prior to the sale or informed the customers that they would receive one around tax preparation time. (GSF ¶ 17.)  The fact packs Sparkman drafted and compiled included completed federal tax forms for a hypothetical program # 4 customer.[3]  In each case, the sample federal tax forms showed a 10% federal investment tax credit, had checked the "material participation" box on the Schedule C, and reflected a § 179 expense for the cost of the solar system.  (Id. ¶ 18; PSF ¶ 18.)

The fact pack used in both 2004 and 2005 contained the following statements:  "Because your second systems are BUSINESS systems of which you hold for the purposes of deriving income you are also entitled to the Federal Investment Tax Credit which includes solar equipment."  "Because your second system/s are income property you are entitled to a section 179-business expense write-off for the entire cost of your new business equipment in one lump sum, all at once, if you desire..."  "Per IRS test # 2 for material participation you pass this test and are considered to actively/materially participate in your trade or business...You are the only one involved."  (GSF, Ex. 9, Doc. #27-23 (emphasis in original).)

---

[3] There is a dispute between Sparkman and the Government regarding whether the 2001 fact pack included sample completed federal tax forms.  (See Reply at 8 n.10.)

The fact packs in years 2003 and 2004 contained statements substantially similar to those found in the 2005 fact pack and described above. (GSF ¶ 20.)  The 2003, 2004, and 2005 fact pacts all contain a discussion regarding "economic substance" and reflected Sparkman's assurances that program # 4 met the IRS's economic substance requirements. (Id. ¶ 21.)  Sparkman argues that for (tax years) 2004 and 2005, Sparkman's materials reflected "alternative" arguments regarding potential passive income treatment.  (Opp'n at 5.)  Sparkman further argues that all of his tax packs all contained a statement that participants were responsible for filing a correct tax return.  (Opp'n at 5.)

Sparkman does not argue that he did not make or cause to be made the above quoted tax statements in conjunction with program # 4.   Therefore, the undisputed facts show that Sparkman made or caused his salespeople to make material tax statements in connection with the organization and sale of 239 programs # 4.  Specifically, Sparkman developed the "worksheet" and drafted the fact pacts, both of which were used in the marketing and/or organization of each program # 4.  Additionally, Sparkman trained or assisted in the training of his salespeople.  Sparkman's salesforce, through the worksheet or as a result of their training, told the participants that they were entitled to I.R.C. §§ 179 and 48 credits and deductions within 12 months.  Additionally, Sparkman's fact packs stated that

10

the participants were entitled to these same credits and deductions, that they materially participated in their purported business, and that the plan had economic substance.

Accordingly, the Court GRANTS Defendant's motion for partial summary judgment as to the Government's contention that Sparkman made tax statements  regarding the allowability of a deduction or credit made in conjunction with program # 4.

III.   Veracity of Sparkman's Tax Statements

For the instant motion, the Government's contention that Sparkman's tax statements were false depends on two considerations: 1) whether program # 4 was of economic substance; and 2) whether the participants materially participated in operation program # 4.  Sparkman urges the Court that the record is not developed enough to decide the Government' motion and that there is little information before the Court about "the activities, conduct, and tax situations" of program # 4 participants.  (Opp'n at 2.)

Section 6700 of the I.R.C. penalizes any person (1) who organizes (or assists in the organization of) any plan or arrangement or who participates (directly or indirectly) in the sale of an interest in a plan or arrangement and (2) makes or furnishes or causes another person to make or furnish (in connection with such

11

organization or sale) a statement with respect to the allowability of any deduction or credit or the securing of any tax benefit by reason of participating in the plan or arrangement (3) which the person knows or has reason to know is false or fraudulent as to any material matter. 26 U.S.C. § 6700 (2001 - 2005).

From 2001 through 2005, Congress, in I.R.C § 48, provided a 10% investment tax credit for taxpayers that purchased solar energy equipment to be used for the production of income or in a trade or business.  26 U.S.C. § 48(a) (2001 - 2005).  Additionally, from 2001 through 2005, Congress allowed taxpayers to expense—at once—certain depreciable business assets pursuant to I.R.C. § 179. 26 U.S.C. § 179 (2001-2005).  Those that elected to expense a business asset did so in lieu of a more traditional, multi-year depreciation schedule.  Id. §§ 169, 179.

I.R.C. § 469 limits a taxpayers ability to deduct losses and credits from activities in which the taxpayer does not materially participate,  26 U.S.C. § 469, and allows losses, credits and deductions from passive activities to offset only passive income.  26 U.S.C. § 469(a)(d).  A taxpayer must "materially participate" in an activity in order for the taxpayer to be considered an "active" participant and in order for the losses, credits, and deductions from that activity to offset, other, unrelated active—primarily wage—income.  26 U.S.C. § 469( c).

12

A.     Economic Substance

In the Ninth Circuit, a sham transaction is one that subjectively lacks a nontax business purpose and objectively lacks economic substance beyond procuring tax benefits.  River City Ranches v. Comm'r., 313 Fed. Appx. 935, 938 (9th Cir. 2009).  In Frank Lyon Co. v. United States, 435 U.S. 561, 562 (1978), the Supreme Court stated:

> [w]here … a genuine multiple-party transaction with economic
> substance[,] which is compelled or encouraged by business or
> regulatory realities, is imbued with tax-independent considerations,
> and is not shaped solely by tax-avoidance features that have
> meaningless labels attached, the Government should honor the
> allocation of rights and duties effectuated by the parties[.]

435 U.S. at 583-584.  This language was subsequently construed by the Ninth Circuit to create a two-part test for determining whether a transaction is a sham: 1) has the taxpayer shown that it had a business purpose for engaging in the transaction other than tax avoidance? 2) has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits?  Casebeer v. Comm'r., 909 F.2d 1360, 1363 (9th Cir. 1990).

In looking at a transaction's economic substance, courts often consider factors including whether the substance of the transaction reflects its form, whether fair market value was paid for the assets, whether an interest (i.e.,

the benefits and risk of ownership) in property was actually transferred, whether debt used to finance the transaction created genuine liability, and whether there was an identifiable business purpose beyond relieving tax liability.  Id. 363-65; Sacks v. Comm'r., 69 F.3d 982, 988 (9th Cir. 1995).

The fact that tax benefits are taken into account in a decision to enter a transaction is not a reason to disallow the benefits; the Ninth Circuit has recognized that "tax laws affect the shape of nearly every business transaction." Sacks, 69 F.3d at 987 (citation omitted).  Also, if the government is deliberating distorting the market to induce certain behavior, a court must analyze the transaction on posttax basis.  Id. 991-992.  As shown by I.R.C. § 48(a) and § 179 above, at the time of Sparkman's transactions Congress purposely used tax incentives in the area of solar energy and equipment to change investors' conduct.

In looking at the economic substance of program # 4, the Court has considered all of the above factors.  The undisputed facts regarding program # 4 show that: 1) Sparkman assigned 52 of the 239 program # 4 participants a ratepayer that previously contracted with HEH/Mercury Solar; 2) at least 69 of the 239 program # 4 participants were linked with ratepayers who chose to prepay their account in one lump sum in lieu of making monthly payments; 3) at least 74 of the 239 program # 4 participants purchased equipment that differed from the

14

equipment actually installed on the customer's ratepayer's home; and 4) at least

138 out of 239 program # 4 participants were either (a) linked with ratepayers that

previously contracted with HEH/Mercury Solar, (b) linked with ratepayers that

chose to prepay in one lump sum their accounts, ( c) purchased equipment that

differed from the equipment that was installed on their ratepayers' homes, or (d)

some combination of these three.  (Id. ¶ 31; PSF ¶ 31a-d.)

      In the case of pre-payments, HEH/ Mercury Solar kept and used the

lump sum payments and informed the customer to report income as if they were

earning a small, monthly fee and reduced the balance owed on the participant's

Mercury Solar loan by that same monthly amount.  PCC credited the participants'

accounts monthly as if their linked ratepayer was making monthly payments.  (PSF

¶¶ 27, 31; PSF, Ex. A.)

      The fact that 138 of the 239 participants were assigned an

HEH/Mercury Solar contract, linked with a prepaid account, or did not get the

equipment they purchased, evidences that in over 50% of the program # 4 plans the

substance of the transaction did not reflect its form.  Moreover, for 52 of the

participants, each participant's purchase of a solar energy system did not actually

cause such a system to be purchased or installed due to the fact that such

participants were linked with ratepayers who already had a system from HEH/Mercury Solar.

Sparkman's argument that the Government is substituting its opinions on business practice for Sparkman's explanations is unavailing.  (See Opp'n at 4.) Sparkman does not argue that the equipment was not mismatched, but argues that most participants received equipment of equal or greater value than for which they paid.  (See Opp'n at 4.)  Here, the value of what was received is not important, rather, the fact that program # 4 lacked real pairings of participants with new rateholders is what indicates a sham transaction.  However, although Sparkman has managed program # 4 in a way that is incompatible with the notion that he created 239 separate, independent microutility owners, there is a genuine issue of material fact as to whether the programs lacked economic substance.

Both the Government and Sparkman argue that Sacks supports their own positions regarding program # 4.  In Sacks, Mr. Sacks invested in solar energy systems, with an intent to lease them to a third party.  Sacks, 69 F.3d. at 983. Sacks purchased the systems to earn a profit after taxes by leasing out solar hot water heaters.  He expected his lease revenue to be at least $24 month per unit, after a two year period in which no rent would be charged.  Rents for the units were to rise in tandem with the cost of oil.  Id. at 985.  Sacks also invested in the

equipment because of the state and federal tax incentives.  Id. at 984.  The Ninth

Circuit concluded that this transaction was not a sham and had economic substance

because Sacks paid fair market value, the tax benefits would have existed for

someone, the "business of putting solar water heaters on homeowners' roofs was

genuine," and the business consequences of a rise or fall in energy prices was

shifted to Sacks.   Id. at 988.

The Government argues that program # 4 differs from the Sacks

transaction because, unlike program # 4, the rents Sacks earned fluctuated based on

the amount the renter actually paid, as opposed to a monthly amount created by

Sparkman due to a previous rateholder's pre-payment.  Additionally, the

Government points out that because the program # 4 ratepayers typically signing

lengthy contracts, unlike Sacks, the program # 4 participant is locked into a fixed

monthly payment and will not earn additional profits based on a fluctuation in the

price of oil.

On the other hand, like Sacks, program # 4 postpones profit during a

waiting period in which the HEH/Mercury Solar loan is paid off.  Although this

waiting period is longer than the two year period in Sacks, the program # 4 rewards

cited by Sparkman include the possibility of commodity or energy prices rising so

that the participant's equipment or its energy would be more valuable at the end of

the typically 12-year PCC contract term.  (Opp'n at 12.)  Sparkman argues that this is a real realization of profit because a photovoltaic system has a conceivable useful life of 50 years.[4]  (See also PSF ¶ 28.)  Also, like Sacks, the tax benefits would have existed for someone because the "business of putting solar water heaters on homeowners' roofs was genuine." As clarified by counsel for Sparkman at the hearing, only the participants claimed tax benefits on the solar equipment installed on the ratepayers' homes.  HEH/Mercury Solar did not claim any deductions, even if it installed equipment prior to the ratepayer being linked with a participant.

Additionally, Sparkman contends that program # 4 participants stood and wanted to make a profit on their venture.  (Opp'n at 2.)  In support, Sparkman argues that program # 4 was not a sham, because in a classic sham there are just paper manipulations without any underlying economic transactions.  (Id. at 3.)  In contrast, Sparkman states that market prices were charged for program # 4 solar

_____

[4] Sparkman also cites Sacks for the proposition that the economic substance doctrine must be hesitantly applied in instances where state and federal legislation has purposely used tax incentives to change investor's conduct.  (Opp'n at 4 (citing Sacks, 69 F.3d at 991).)   Sparkman states that the "solar energy industry is dependent upon tax incentive."  (Id. at 12.)  Plaintiff is correct that Congress provided incentives for installing solar energy equipment for business purposes. However, the presence of an incentive alone does not add legitimacy to a program that in and of itself has no economic substance and is developed purely to take advantage of such an incentive.

equipment, and funding was in part secured through Wells Fargo, a known commercial and consumer lender.  (Id.)  At the hearing, counsel for the Government clarified that the participants alone were liable on these loans with Wells Fargo.  Sparkman also points to the fact that participants could have suffered financial losses as they were personally liable through secured obligations on the notes to HEH/Mercury Solar and, thus far, Participants when asked understood they would be responsible for those losses as a risk of investing in program # 4. (Id. (citing PSF ¶ 9C), 11.)  However, as the Government notes, many of these loans made by HEH/Mercury Solar were linked with pre-paid ratepayers that eliminated a risk of default.

Analyzing program # 4 from the participants' subjective standpoint, the program is a tax-motivated transaction which Sparkman marketed to individuals with enough tax liability to offset the provided for tax credits.  (GSF ¶ 15; PSF ¶ 15.)  However, besides the tax credits and some of the participants interest in solar energy, there is evidence that the participants may have believed that they would make some profit on their investment in program # 4 based upon the Sparkman's deal worksheets, the fact that the small "ratepayer" monthly payments served to reduce their loan to Mercury Solar, and the possibility of profit at the end of the participant's loan period.  (GSF ¶ 28 & Ex. E.)  Further, these

were not transactions without sheep because on a one to one ratio of participant to ratepayer, some solar energy equipment was actually installed and an actual loan was made.  See River City Ranches, 313 Fed. Appx. at 938.  Sparkman has provided the Court with little evidence to this effect, but enough to avoid summary judgment on the issue, including an expert rebuttal report as detailed below.

In support of their motion, the Government hired Dr. Eric Mais, a Professor of Finance from the University of Hawaii, to review program # 4 to determine what, if any, profit could be earned from participating in program the program.  (GSF, Ex. L.)  As required, Dr. Mais included, as an immediate offset to the cost of the equipment, all federal and state tax credits and the § 179 depreciation expense in order to analyze the program on a posttax basis, i.e., Dr. Mais gave the investors the benefit of the tax credits up front and then viewed program # 4 as a stand alone investment.  (Id.); see Sacks, 69 F.3d at 991-992. Dr. Mais concluded that it was unlikely that program # 4 would generate a profit, unless the purported depreciation deductions could be used to offset income unrelated to that derived from program # 4. (Id.)

Dr. Mais' report focused on immediate profit to the participant.  In opposition, Sparkman submitted a rebuttal expert report by Dr. Thomas Loudat, Ph.D.  (PSF ¶ 29 & Ex. U.)  Dr. Loudat found that the average rate of return to the

participants exceeded that of the small-company stock rate of return provided by Dr. Mais and opined by him to be the appropriate benchmark for to assess program # 4 investment returns.  (<u>Id.</u>)  Additionally, at the hearing counsel for Sparkman noted that if the entire ratepayer lump-sum payment was counted up front, as the Government argues Sparkman should have done for the prepaying ratepayers, this lump-sum payment would create a near immediate return to the participants on their program # 4 investment.

It cannot be stated as a matter of law on this record that the participants were simply paying a fee in exchange for tax benefits.  Although the Government financial expert reviewed the transaction and concluded that there is not a reasonable likelihood of earning a profit from program # 4, the Court must take all facts in the light most favorable to Sparkman as the nonmoving party. Thus, there is a genuine issue of material fact as to whether program # 4 has economic substance.  The fact that Sparkman ran program # 4 in a such manner that the substance of the transaction did not reflect its form, does not, in this case, take away from the fact that a genuine issue of material fact remains as to the program # 4's economic substance.

B.     Material Participation

Material participation is defined as regular, continuous, and substantial involvement in the operations of an activity.  26 U.S.C. § 469(h).  The regulations accompanying I.R.C. § 469 contain seven tests for determining whether someone materially participates in an activity.  Test number 2 states: the taxpayer's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals.  26 C.F.R. § 1.469-5T(a)(2).  Test number 3 states: the taxpayer's participation in the activity for the taxable year constitutes more than 100 hours and is not less than the participation in the activity of any other individual for such year. 26 C.F.R. § 1.469-5T(a)(3).

Taxpayers use tax form Schedule C to report any profit or loss from a business.  This Schedule requires a taxpayer to identify whether he or she "materially participated" in the operation of a business activity. (See GSF, Ex. 9.) The passive activity rules in I.R.C. § 469 prohibit an investor from offsetting passive losses with active, wage income.

In Sparkman's promotional material, Sparkman advises the participants that they materially participate because they "review the initial worksheet," "receive income and expense reports," "pay Wells Fargo loans,"

22

"prepare their Schedule C," and market program # 4 to new potential participants. (Id., Ex. 9.) The Government does not deny that the participants did these activities (with the exception of marketing), but argues that they were done in the participants' capacity as investors and investment-related activity is not included in determining a taxpayer's participation level under the passive activity loss rules. 26 C.F.R. § 1.469-5T(f).  Further, the Government points to the fact that Mercury Solar provided each participant with a pre-packaged tax plan, complete in some cases with a pre-existing ratepayer client that had often already prepaid his contract, that PCC communicated and coordinated with the ratepayer without assistance from the purported owner and handled any mechanical problems, and that PCC took care of state taxes and accepted responsibility for moving the equipment in the event the ratepayer stopped paying.

In opposition, Sparkman relies on material participation tests number 2 and 3.  1.469(a)(2) & (3).  In support, Sparkman contends that the program # 4 investors actively participated in their business because they agreed to market additional Mercury Solar energy equipment.  The Government argues that Sparkman admitted that 70-80% of the customers did not market in any material way and that only 12 participants received marketing income.  According to Sparkman, Mercury Solar paid out thousands of dollars for referrals,

23

approximately $33,333, and appointments during the time period 2001 through 2005, including 2004 and 2005.  (PSF, Exs. Y-2 & X-4.)  Further, Sparkman argues that the participants' time spent marketing that was unsuccessful must also be factored into time spent on their businesses.

The way in which Sparkman and PCC managed the program indicates that Sparkman exercised much control over program # 4.  However, evidence regarding all 239 participants is not in the record and the Government fails to account for unsuccessful marketing attempts as time spent participating.  Further, as argued at the hearing, the participants were not able to install the solar equipment in the ratepayers' homes or provide maintenance as they are not licensed to do so—this function was necessarily provided by Sparkman. Sparkman's materials also characterize PCC's function as that of a "bookkeeper" hired by the participant, a function that is often hired out by business owners.

Moreover, it is unknown whether these 239 participants chose to passively invest in Sparkman's solar energy business despite Sparkman's claim that they could be considered to have materially participated if they followed his guidelines or if they were in fact materially participating because of their actions in marketing the products.  Sparkman attaches the declaration of at least one participant who possibly met test 2 and/or 3 of 26 C.F.R. § 1.469-5T.  (PSF ¶¶ 22,

22A.)  Sparkman also provides an example of one participant who signed up for program # 4 with no intention of following Sparkman's advice.  (Opp'n at 6.) While this example does not in anyway detract from the possibility of Sparkman's advice being fraudulent, it shows that the 239 participants were independent in their participation in or characterization of program # 4.  (Id.)

Although the Government argues that the activity of the participants is immaterial to whether or not Sparkman made a false statement, in the context of material participation such activities necessarily inform the statements' veracity. The Government does not show as a matter of law that even if participants followed Sparkman's materials, they would still not have met the test for material participation.  (See GSF, Ex. 9 at 4.)  The Government does not contend that if the time table in Sparkman's materials was followed by all participants that Sparkman's statements would have been false.

Even discounting the time conceded by Sparkman to be that of an investor, Sparkman raises a material issue of fact as to the participation of participants—marketing and otherwise.  (See Opp'n at 8; GSF, Ex. 9 at 5.)  On the record, the Government has failed to meet its burden of proof on its submission. The Government does not set forth ratios of time for each participant, instead it presumes that only marketing that was compensated by PCC would count for

25

purposes of material participation and discounts all other time spent by the participants as that of investors.  Further, the Government does not show in Sparkman's deposition the time period covered by his statements attempting to explain the level of marketing.  (See GSF, Ex. A at 241.)  It is a question of material fact how many Participants conducted marketing, whether successful or not.  (Id. at 241:1-18.) Although marketing may not have been required for program # 4, taking all the facts in the light most favorable to Sparkman, the program # 4 materials show that marketing was contemplated as part of the program and could have acted to expand each participant's business and generate profit .  (See GSF, Ex. 9.)

The Court cannot find as a matter of law that all of the 239 program  # 4 participants did not materially participate.  Taking all of the evidence in the light most favorable to Sparkman, there is a genuine issue of material fact as to whether the participants materially participated in program # 4.

Accordingly, the Court DENIES Defendant's motion for partial summary judgment as to the Government's contention that the tax statements made by Sparkman were false.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.

The Court GRANTS Defendant's motion for partial summary judgment as to the Government's contention that Sparkman organized and participated in the sale of program # 4 and the Government's contention that Sparkman made tax statements  regarding the allowability of a deduction or credit made in conjunction with program # 4.  The Court DENIES Defendant's motion for partial summary judgment as to the Government's contention that the tax statements made by Sparkman were false.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 28, 2009.



_____
David Alan Ezra
United States District Judge

<u>Sparkman v. United States</u>, CV. NO. 08-00087 DAE-BMK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT